UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHANA SIGLER,<br>individually and on behalf of all<br>others similarly situated,<br><br>      Plaintiff<br><br>  v.<br><br>HOMESITE GROUP INC.,<br><br>      Defendant. | Case No. 24-cv-12477-DJC |

**MEMORANDUM AND ORDER**

**CASPER, C.J.**                           December 12, 2025

**I. Introduction**

Plaintiff Shana Sigler ("Sigler") has filed this putative collective action lawsuit against Defendant Homesite Group Inc. ("Homesite") alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* ("Count I"), the Arizona Wage Statute, Ariz. Rev. Stat. § 23-350 *et seq.* ("Count II") and unjust enrichment ("Count III"). D. 1. Sigler has now moved to certify a collective action conditionally on behalf of herself and all others similarly situated under 29 U.S.C. § 216(b). D. 33. For the reasons discussed below, the Court DENIES Sigler's motion for conditional certification.

**II. Legal Standard**

The FLSA allows employees to bring collective actions to recover unpaid minimum wages or unpaid overtime compensation on behalf of themselves and other employees "similarly situated." 29 U.S.C. § 216(b); see Romero v. Clean Harbors Surface Rentals USA, Inc., 368 F.

1

Supp. 3d 152, 160 (D. Mass. 2019) (noting that "[t]he FLSA allows employees to band together to enforce their rights by initiating or joining a collective action"). "The Supreme Court has noted that the FLSA itself is meant to offset the superior bargaining power of employers both for particular employees at issue and broader classifications, and to offset the resulting general downward pressure on wages in competing businesses." Skirchak v. Dynamics Research Corp., 508 F.3d 49, 58 (1st Cir. 2007) (citing Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 302 (1985)).

"Unlike a class action under Federal Rule of Civil Procedure 23, collective actions under the FLSA 'require similarly situated employees to affirmatively opt-in and be bound by any judgment.'" Romero, 368 F. Supp. 3d at 160-61 (quoting Cunha, 221 F. Supp. 3d at 181). "To facilitate this opt-in mechanism, courts have developed a certification process for plaintiffs seeking to bring FLSA collective actions." Id. at 161. Although the First Circuit has not adopted a specific certification procedure, "most courts—including most district courts in this circuit—follow a two-step approach." Romero, 368 F. Supp. 3d at 161 (internal quotation marks and citation omitted); see, e.g., Austin, 771 F. Supp. 3d at 5-6; Humphries v. Medminder Sys., Inc., No. 24-cv-10559-IT, 2025 WL 1279376, at *1 (D. Mass. May 2, 2025); Jiang v. Kobe Japanese Steakhouse, Inc., No. 22-cv-11867-FDS, 2024 WL 4872395, at *9-10 (D. Mass. Nov. 22, 2024); Dyse v. HealthAll Consulting, 433 F. Supp. 3d 35, 38 (D. Mass. 2020); see also Reeves v. Alliant Techsystems, Inc., 77 F. Supp. 2d 242, 246 (D.R.I. 1999) (citing, among other cases, Lusardi v. Xerox Corp., 118 F.R.D. 351, 361 (D.N.J. 1987)).

"First, 'the court makes an initial determination of whether the potential [collective] should receive notice of the pending action.'" Romero, 368 F. Supp. 3d at 161 (quoting Trezvant v. Fidelity Emp. Servs. Corp., 434 F. Supp. 2d 40, 42 (D. Mass. 2006)). "[T]his determination is made using a fairly lenient standard, which typically results in conditional certification." Id.

2

(quoting Trezvant, 434 F. Supp. 2d at 43).  To issue notice, "[t]he plaintiff must show only 'that there is some factual support'—as opposed to mere allegations—that the potential plaintiffs are similarly situated." Id. (quoting Cunha, 221 F. Supp. 3d at 182).  "Courts have held that plaintiffs can meet this burden by making a modest factual showing or asserting substantial allegations that 'the putative class members were together the victims of a single decision, policy, or plan that violated the law.'" Trezvant, 434 F. Supp. 2d at 43 & n.2 (defining "substantial allegations" as "detailed allegations supported by affidavits that successfully engage defendant's allegations to the contrary") (emphasis omitted) (quoting Thiessen v. Gen. Elec. Capital, 267 F.3d 1095, 1102 (10th Cir. 2001).

"Second, after discovery is complete, the court makes a final 'similarly situated' determination." Romero, 368 F. Supp. 3d at 161 (quoting Trezvant, 434 F. Supp. 2d at 42). "Pertinent factors at this [later] stage include:  (1) any disparate factual and employment settings— for example, whether various plaintiffs were employed in the same corporate department, division, and location; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." Id. (citing Trezvant, 434 F. Supp. 2d at 45).

Homesite urges the Court to reject the application of this two-step approach, also referred to as the Lusardi test, see Jiang, 2024 WL 4872395, at *9 n.8, in favor of a higher standard for collective action conditional certification.  D. 42 at 9; D. 65 at 2-3; see, e.g. Swales v. KLLM Transp. Servs., 985 F.3d 430, 434 (5th Cir. 2021) (rejecting the Lusardi approach and holding that notice may issue only if plaintiffs can demonstrate "from the outset of the case" that notice recipients "are actually similar to the named plaintiffs" by a preponderance of evidence); Clark v. A&L Homecare & Training Ctr., LLC, 68 F. 4th 1003, 1009, 1011 (6th Cir. 2023) (rejecting the Lusardi approach and concluding notice may issue only if plaintiffs "show a 'strong likelihood'

3

that [other] employees are similarly situated to the plaintiffs themselves"); Richards v. Eli Lilly & Co., 149 F. 4th 901, 912-13 (7th Cir. 2025) (rejecting the Lusardi approach and concluding that "to secure notice, a plaintiff must first make a threshold showing that there is a material factual dispute as to whether the proposed collective is similarly situated" by "produc[ing] some evidence suggesting that they and the members of the proposed collective are victims of a common unlawful employment practice or policy" which "need not be definitive, but defendants must be permitted to submit rebuttal evidence and, in assessing whether a material dispute exists, courts must consider the extent to which plaintiffs engage with opposing evidence").

Since the Court concludes that Plaintiffs have not satisfied even the application of the Lusardi standard, the Court declines Homesite's invitation to adopt another standard. In Waters v. Day & Zimmermann NPS, Inc., 23 F. 4th 84, 89 (1st Cir. 2022), the First Circuit noted that "district courts at or around the pleading stage have developed a 'loose consensus' regarding conditional certification procedures," see Campbell v. City of Los Angeles, 903 F.3d 1090, 1108-09 (9th Cir. 2018), and described the conditional certification process as "entail[ing] a 'lenient' review of the pleadings, declarations, or other limited evidence to assess whether the 'proposed members of a collective are similar enough to receive notice of the pending action.'" Id. (internal citations omitted); see Kwoka v. Enter. Rent-A-Car Co. of Boston, LLC, 141 F. 4th 10, 22 (1st Cir. 2025) (reiterating same). That is, this standard remains in place and it is a substantive test that requires factual support, not mere allegations, that the plaintiff is similarly situated to the class she proposes. See Romero, 368 F. Supp. 3d at 161; Burns v. City of Holyoke, 881 F. Supp. 2d 232, 234 (D. Mass. 2012) (noting that the [Lusardi] standard explaining that "'as a matter of sound case management' and to avoid 'a frivolous fishing expedition at the employer's expense,' courts should generally require the party moving for conditional certification to make 'a preliminary factual showing that there actually exists a similarly situated group of potential plaintiffs'")

4

(quoting Melendez Cintron v. Hershey P.R., Inc., 363 F. Supp. 2d 10, 18 (D.P.R. 2005)). Lusardi requires same and recent decisions, at minimum, explain the reasons why a meaningful, gatekeeping standard is warranted. See, e.g. Richards, 149 F. 4th at 911; Clark, 68 F. 4th at 1010; Swales, 985 F.3d 440-41. This is particularly true where the certification determination is made further away from the pleading stage. Jiang, 2024 WL 4812395, at *10 (noting that the "rationale for permitting a minimal showing is weakened by the comparatively late stage of the case at which this motion for conditional certification is being considered"). Here, the Court employs the Lusardi standard to determine whether conditional certification is warranted.

### III.  Factual Background

The following facts are drawn from allegations set forth in the complaint, D. 1, Sigler's sworn declaration in support of Sigler's motion to certify, D. 33; D. 33-1, Angela Troche ("Troche")'s sworn declaration, D. 57-5, Homesite's opposition and the sworn declaration of Jessica Sadeghi-Guran submitted therewith, D. 42; D. 43, and accompanying documents. See Dyse, 433 F. Supp. 3d at 38 (noting that "[o]n a motion for conditional certification, the court may consider 'the pleadings and any affidavits which have been submitted'") (quoting Trezvant, 434 F. Supp. 2d at 43).

Homesite is a property and casualty insurance company headquartered in Boston, Massachusetts. D. 1 ¶ 12. From February 13, 2023 to October 26, 2023, Sigler was employed by Homesite in Phoenix, Arizona as a remote Customer Solutions Agent ("CSA"). See id. ¶ 19 (initially alleging Sigler was employed as a Customer Sales Representative); D. 33-1 ¶ 3; D. 43 ¶¶ 12, 17-18; see also D. 44 at 1 n.1. Sigler asserts she worked at least forty hours weekly for most of her employment with Homesite and during that time she was classified and paid as a non-exempt employee. D. 33-1 ¶ 4; see D. 1 ¶¶ 19, 24; see also D. 43 ¶¶ 13, 17.

Sigler alleges that during the class period of September 27, 2021 through the present, Homesite failed to compensate her and members of the putative collective action for the time spent completing tasks that were integral and indispensable to the principal activities of CSAs before their shift starting times and after their shift ending times, and that Homesite failed to compensate them for working overtime in violation of the FLSA, 29 U.S.C. § 207. D. 1 ¶¶ 25-27, 38; D. 33-1 ¶¶ 18, 21-22; see D. 57-5 ¶¶ 6-8, 14. Sigler seeks to include in the collective action group all current and former CSA employees and all other workers with the similar job titles and/or positions of Homesite during the period of three years proceedings the commencement of this action [September 27, 2021] to the present. D. 33 at 1; D. 33-2 at 2.

Sigler contends that remote CSAs answer inbound telephone calls from customers regarding their Homesite insurance policies and perform other related job duties, such as sales of Homesite products. D. 33-1 ¶ 5; see D. 57-5 ¶ 9. The CSA job is primarily performed on the computer and telephone from home. Id. Sigler alleges that prior to clocking in, she and other members of the putative collective action needed to "boot up" their computer, start and log into Homesite's computer systems, software applications, programs and phone system. D. 1 ¶ 27; D. 33-1 ¶ 10; see D. 57-5 ¶ 6. The pre-shift tasks also included troubleshooting/corresponding with supervisors and/or Homesite employees due to computer system crashes or other technological issues. D. 1 ¶ 27; D. 33-1 ¶ 11; see D. 57-5 ¶ 8. Sigler asserts that booting up computers and ensuring that Homesite's programs and systems were running correctly were necessary and indispensable parts of CSAs principal activities. D. 1 ¶¶ 28-29; D. 33-1 ¶ 12; see D. 57-5 ¶¶ 10, 12. Sigler allegedly spent approximately twenty to thirty minutes prior to the start of her shift on most days, if not every day, booting up her computer, starting and logging into computer systems and programs, reviewing emails and reviewing Homesite's updated policies regarding job procedures so she could accurately assist customers. D. 1 ¶ 31; D. 33-1 ¶¶ 10-11, 14, 16. Troche

6

attested she began her work activities approximately one hour before the start of her scheduled shift.  See D. 57-5 ¶ 6.

Sigler asserts that CSAs were told by supervisors to perform this work "before [they] were on the clock" so they could be ready to take phone calls as soon as they were logged into the phone and the shift began, and that "it was emphasized that high productivity numbers were important for [their] jobs."  D. 33-1 ¶¶ 8-9, 15.  Sigler alleges that "[s]upervisors told [Sigler], and many others, only to punch in shortly before taking the first call" and that "[b]ooting up the computer, starting and logging into Homesite's computer systems, numerous software applications and programs, and phone system, and ensuring that each program/system is running correctly, before clocking in increased our productivity stats."  D. 33-1 ¶¶ 6, 8.  Sigler asserts that CSAs' productivity partially determined whether supervisors qualified for incentive payments/bonuses and that Homesite monitors their phone calls "to, amongst other things, grade [their] customer service quality and determine [their] productivity."  D. 33-1 ¶¶ 7, 17.

Sigler alleges that CSAs, including herself, were also required to perform unpaid work after the end of their shifts each day including, completing job duties after the last call, documenting calls, sending emails, corresponding with supervisors and closing and logging out of Homesite's computer systems, software applications and programs and phone system.  D. 1 ¶ 33; D. 33-1 ¶ 21; see D. 57-5 ¶ 7.  Sigler spent approximately five minutes or more to complete these activities after the end of her shift on a regular basis.  D. 1 ¶ 33; D. 33-1 ¶ 22.  Troche attested she spent at least twenty minutes after the scheduled end of her shift performing job duties.  See D. 57-5 ¶ 7.  Sigler asserts that CSAs that failed to boot their systems before the shift started and were not ready to answer phone calls faced discipline.  D. 1 ¶ 32; D. 33-1 ¶¶ 19-20; see D. 57-5 ¶¶ 15-16.  If Sigler and members of the putative collective action clocked in prior to five minutes before their shift start time or one minute after their shift start time, they were also subject to discipline.

7

D. 1 ¶ 32.  Sigler alleges that the "only way to be ready on time, and avoid discipline, is to perform compensable work off-the-clock'" without pay.  D. 1 ¶ 32.

Sigler asserts that the requirement to work overtime, including by performing off-the-clock tasks, was "unavoidable due to production/productivity quotas" and "practically ascertainable" to Homesite.  D. 1 ¶¶ 36-37.  Homesite allegedly applied the improper wage practices of underpaying for time worked off-the-clock and not paying overtime compensation to CSAs and employees with similar job positions and/or duties because they were subject to the same practices, worked under the same terms, were paid the same way and "were told about the timekeeping, productivity requirements, and pay policies by [their] supervisors at the same time during group chats."  D. 33-1 ¶¶ 23-25; D. 57-5 ¶¶ 17-19.

**IV.   Procedural History**

Sigler instituted this action on September 27, 2024.  D. 1.  On April 30, 2025, she moved to certify a collective action conditionally pursuant to 29 U.S.C. § 216(b), D. 33.  The Court heard the parties on the pending motion to certify a collective action conditionally and took the matter under advisement.  D. 64.

**V.   Discussion**

Sigler requests that the Court conditionally certify the following collective action group: all current and former Homesite Customer Solutions Agents and all other workers with similar job titles and/or positions during the period of three years preceding the commencement of this action [September 27, 2021] to the present.  D. 33 at 1; D. 33-2 at 2.  Homesite opposes conditional certification, arguing that Sigler has not met her burden of presenting sufficient evidence of an unlawful common policy, plan or practice that violated the FLSA, D. 42 at 10-13; D. 65 at 3-4, that the putative collective is factually similar, D. 42 at 13-15; D. 65 at 4-5, or that putative collective members are interested in joining the lawsuit, D. 42 at 15-16; D. 65 at 5-6.

8

Although the determination that a putative collective is similarly situated "is made using a fairly lenient standard" at the initial notice stage of the two-step approach, "the standard is not 'invisible.'" Jiang, 2024 WL 4872395, at *10 (quoting Burns, 881 F. Supp. 2d at 234). Sigler is "required to put forth some evidence that the legal claims and factual characteristics of the [collective] in this case are similar." Trezvant, 434 F. Supp. 2d at 44. Here, Sigler has not satisfied the "'modest factual showing' required at step one of the FLSA certification procedure" to warrant certification of the collective. Romero, 368 F. Supp. 3d at 162 (quoting Trezvant, 434 F. Supp. 2d at 43).

### A. Sigler Lacks the Sufficient Factual Showing Necessary to Show that the Putative Collective Members Share Similar Factual Characteristics and Were Subject to a Common Policy or Plan

In support of her request for collective certification, Sigler submitted her own declaration, D. 33-1, the declaration of Troche, a former Homesite CSA employee from January 2018 through March 2025, D. 57-5, and an email from a redacted source, D. 57-6. Although "the submission of additional affidavits beyond those of the named plaintiffs is not necessary to make a 'similarly situated' showing, . . . the court [must be] satisfied 'that there is a basis to conclude that questions common to a potential group of plaintiffs would predominate a determination of the merits in [the] case.'" Trezvant, 434 F. Supp. 2d at 45 (quoting Mike v. Safeco Ins. Co., 274 F. Supp. 2d 216, 220 (D. Conn. 2003)); see Myers v. Hertz Corp., 624 F.3d 537, 555 (2d Cir. 2010) (noting that "[t]he 'modest factual showing' cannot be satisfied simply by 'unsupported assertions'") (internal citation omitted).

Sigler and Troche are similarly situated in some cursory ways but not as to Homesite's alleged *de facto* policy of supervisors instructing CSAs to clock in shortly before taking their first call and to "boot up" their computer systems, software and programs before being on the clock. See D. 33-1 ¶¶ 6, 8-9. For example, Troche was also employed as a remote CSA at Homesite in

9

2023 and her job responsibilities were nearly identical to those alleged by Sigler. See D. 33-1 ¶¶ 3-5; D. 57-5 ¶¶ 3-5. Sigler and Troche attest that CSAs in the proposed collective performed substantially similar job duties, including answering telephone calls regarding Homesite's insurance policies and selling Homesite products, and primarily performed their work on the computer and telephone. D. 33-1 ¶ 5; see D. 57-5 ¶ 9; see Austin, 771 F. Supp. 3d at 7 (concluding plaintiffs met burden where they were "all employed by one company, [were] all hourly employees, all [held] similar positions with similar duties [], and all allege Defendant's failure to compensate for time spent on the same activities"); see also Cunha, 221 F. Supp. 3d at 182 (concluding putative collective members had the same salary classification, general duties and responsibilities regardless of grade or location). Sigler and Troche also attest that they spent time off-the-clock before and after their shifts logging into and out of Homesite's computer systems, software and programs, with Sigler alleging she spent approximately twenty to thirty minutes before her shift and approximately five minutes after her shift performing job related tasks, see D. D. 33-1 ¶¶ 10-11, 13-14, 22, and Troche alleging she spent approximately one hour before her shift and at least twenty minutes after her shift doing same, see D. D. 57-5 ¶¶ 6-7; see Preston v. World Travel Holdings, Inc., No. 23-cv-12389-JEK, 2024 WL 519548, at *5 (D. Mass. Feb. 9, 2024) (recognizing "all eighteen declarant agents worked remotely, and . . . spen[t] some amount of uncompensated off-the-clock time logging [onto system]" and concluding collective members were similarly situated despite variations in alleged uncompensated time). Even so, Sigler has not established that the putative collective members share a common legal claim and may proceed as a collective because they were subject to a "single decision, policy or plan that violated the law." Kane, 138 F. Supp. 2d at 214) (concluding the record suggested that "Defendants had a policy of treating at least some of a discrete class of employees (i.e. Crew Coordinators) as exempt from the FLSA overtime requirements" and limiting the conditional class only to Crew Coordinators). The

10

Court understands that Sigler alleges a *de facto* policy of supervisors instructing CSAs "only to clock in right before [they] were ready to interact with customers, and only after [they] booted up and/or logged into the computer systems, numerous software applications, and phone system, and ensured that each program/system is running correctly, so that [they] were ready to take calls as soon as [their] scheduled shift began," D. 33-1 ¶¶ 6, 8-9, contrary to Homesite's written policy instructing employees to record time spent logging into and out of Homesite's systems, see D. 43 ¶¶ 3-4, 20; D. 43-1 at 1.  Troche's declaration, however, does not include any allegations of supervisors instructing or pressuring her not to clock in early or record her time spent working outside her shift hours to support Homesite's alleged *de facto* policy.

Sigler and Troche assert that Homesite did not compensate CSAs for off-the-clock work performed before and after their shifts and failed to pay them for working overtime in workweeks in which they worked forty hours or more.  D. 1 ¶¶ 25-27, 38; D. 33-1 ¶¶ 18, 21-22; see D. 57-5 ¶¶ 6-8, 14.  Additionally, they contend that Homesite's improper wage practices were applied company-wide to CSAs because they worked under the same terms as other CSAs, were paid the same way and "were told about the timekeeping, productivity requirements, and pay policies by [their] supervisors at the same time during group chats."  D. 33-1 ¶¶ 23-25; D. 57-5 ¶¶ 17-19.  Sigler and Troche, however, do not offer a basis for these assertions other than their understanding and belief.  See Trezvant, 434 F. Supp. 2d at 43, 51 (noting that an "unsupported allegation of a common plan" is insufficient for conditional certification and limiting certification to office where employees worked because defendant "made no admission that they classify all [employees] as exempt"); see Keller-Brittle v. Collecto Inc., No. 18-cv-11836-ADB, 2018 WL 6199568, at *3 (D. Mass. Nov. 28, 2018) (limiting the certified collective to only include employees in one location and noting that plaintiffs' "knowledge of the commission payment policy at issue are based solely on their experiences at [a] Massachusetts location, and they provide no evidence from which the

11

Court can reasonably infer that [defendant] has a single company-wide policy for paying commissions"); see also O'Donnell v. Robert Half Int'l, Inc., 429 F. Supp. 2d 246, 250 (D. Mass. 2006) (noting that "[o]ne cannot merely assume, as the plaintiffs have here, that [defendant's] employees throughout the country and corporate structure were subject to the same 'policy' of an allegedly improper exemption"). Notably, there is no factual showing or any allegations that Sigler and Troche, or other putative collective members, shared the same supervisors or managers or that such instructed them all not to clock in earlier than a few minutes prior to the start of their shifts. See Norceide v. Cambridge Health Alliance, 814 F. Supp. 2d 17, 29 (D. Mass. 2011) (concluding plaintiffs made "a modest factual showing that the putative class members were all subject to [defendant's] practice of discouraging its workers from recording time worked before and after their shifts" and they "were all allegedly either explicitly or implicitly 'discouraged' by their managers from reporting any time worked during meal breaks or before/after their shifts"). Sigler has not put forth any information to support her assertions that other putative collective members were also told by supervisors to "boot up" and perform other job duties "before [they] were on the clock" so they could be ready to take phone calls as soon as they were logged into the phone and the shift began, D. 33-1 ¶¶ 8-9, 15, and to "only to punch in shortly before taking the first call," id. ¶¶ 6, 8; D. 65 at 3-6. See Trezvant, 434 F. Supp. 2d at 50 (concluding employees were similarly situated with regards to their legal claims where they each "identified a practice in which analysts were told that they were not entitled to overtime pay and promised by the company that, instead, they would receive [compensatory] time [off] for the long hours they worked"); Litz v. Saint Consulting Grp., Inc., No. 11-cv-10693-GAO, 2012 WL 549057, at *2 (D. Mass. Feb. 17, 2012) (allowing conditional certification where employees had "the same general job description and duties, ha[d] similar terms of employment, record[ed] and bill[ed] their time on an hourly basis, and receive[d] similar training and directives from management"). As the court noted in Wright

12

v. Liberty Mutual Grp. Inc., 683 F. Supp. 3d 91, 95-96 (D. Mass. 2023), the conditional classes in Litz, 2012 WL 549057, at *2, and Cunha, 221 F. Supp. 3d at 182, "were not conditionally certified merely because the putative class members held similar jobs and similar duties" and "[i]nstead, the conditional classes were certified on the grounds that they were comprised of employees subject to a common policy or plan (i.e. classification as exempt) which, in combination with the evidence of their similar jobs and duties proffered in those cases, allegedly violated the FLSA." Id.

Sigler attests that CSAs' productivity partially determined whether supervisors qualified for incentive payments/bonuses, D. 33-1 ¶ 7, that Homesite monitored their phone calls "to, amongst other things, grade [their] customer service quality and determine [their] productivity," id. ¶ 17, and that supervisors "emphasized that starting work early would increase [their] productivity stats, id. ¶ 9. Sigler also alleges that if she or members of the putative collective action clocked in prior to five minutes before their shift start time or one minute after their shift start time, they were subject to discipline and that "only way to be ready on time, and avoid discipline, [was] to perform compensable work off-the-clock'" without pay. D. 1 ¶ 32. Notwithstanding those allegations, Sigler has not made the requisite preliminary showing that any other putative class members, including Troche, were subjected to the same *de facto* policy and/or practice she alleges of being "pressured to underreport their time worked," see D. 34 at 12. See Pugliese v. Gov't Emps. Ins. Co., No. 21-cv-11629-DJC, 2022 WL 1129341, at *3 (D. Mass. Apr. 15, 2022) (allowing conditional certification where plaintiffs satisfied "modest factual showing" because their "declarations support their allegations that a substantial number of Massachusetts Adjusters were subject to [defendant's] company practice of directing Adjusters to enter 7.75-hour days and 38.75-hour weeks, with a forty-five-minute meal deduction, despite working more than forty hours a week, without a meal break"). In Pearl v. Clearlink Partners, LLC, 546 F. Supp. 3d

32, 34 (D. Mass. 2021), for instance, the plaintiff alleged that contrary to a written policy she had received, "she was [verbally] instructed never to report overtime hours and, if she did, her timesheet would be denied and she would not be paid. To comply with those instructions, she report[ed] she uniformly entered her time worked as 40 hours per week, regardless of her actual work hours." Id. In that case, unlike here, other employees submitted supporting affidavits attesting they were also "told not to report work in excess of 40 hours per week, [] had informed their supervisors that they were routinely working overtime to complete their assigned caseloads but [] were never paid overtime compensation." Id. The Court concluded "the plaintiff [had] made a preliminary factual showing that, regardless of job title or exemption status, all putative class members were subjected to a common, unwritten policy of [defendant] that denied them overtime compensation" and allowed conditional certification. Id. at 36.

Sigler additionally relies upon an email from a redacted source in response to her counsel's outreach to "current or former Customer Solutions Agents" from a list produced by Homesite following the Court's May 23, 2025 Order (Boal, M.J.), D. 44. D. 57-4; see D. 57 at 5. Although the CSA witness stated that "[i]t takes me 1/2 [sic] to log in. I always just [sic] 15 minutes because that wouldn't be approved," D. 57-6 at 1, this correspondence does not support Sigler's allegations that Homesite has a company-wide common policy of supervisors instructing or pressuring CSAs to perform work off-the-clock without reporting it or that a collective of CSAs similarly situated to Sigler exists. See Rodgers v. CVS Pharmacy, Inc., No. 05-cv-770T-27MSS, 2006 WL 752831, at *4 (M.D. Fla. Mar. 23, 2006) (noting that an anonymous source in an article did not allege their time was "shaved" and that the "vague reference to a wage violation made by an anonymous former employee who worked at an undisclosed location is insufficient to support Plaintiff's motion [seeking conditional certification of a collective action]").

### B.     Interest in Joining the Lawsuit

"District courts around the Country—and within the First Circuit—have split as to whether a named plaintiff must identify the names of other potential class members who are interested in joining the lawsuit in order to secure conditional certification under the FLSA." Perez v. Shucks Me. Lobster LLC, 15-cv-00348-JAW, 2016 WL 6304674, at *6 (D. Me. Oct. 27, 2016) (collecting cases); see Litz, 2012 WL 549057, at *2 (noting that "[a]lthough some courts have imposed this additional requirement, it has not been adopted by the First Circuit"); see Jiang, 2024 WL 4872395, at *11 (noting that "[p]laintiffs must present information, i.e., more than speculation or bald assertions by the plaintiffs, that putative class members are interested in joining the suit") (quoting O'Donnell v. Robert Half Int'l, Inc., 534 F. Supp. 2d 173, 179 (D. Mass. 2008)); see Chavira v. OS Restaurant Services, LLC, No. 18-cv-10029-ADB, 2019 WL 4769101, at *9 (D. Mass. Sept. 30, 2019) (noting that "it has not been this Court's practice to require named plaintiffs to provide it with names of potential class members who are actually interested in joining the collective action").

Here, Sigler argues that Homesite has effectively prevented Sigler's counsel from contacting putative collective members, see D. 57 at 4-5, by objecting to the use of the list (that it was compelled by the Court to produce) when it learned that Sigler was using it to contact putative members of the collective action. D. 65 at 3 & nn. 2-3; cf. Bowens v. Atlantic Maint. Corp., 546 F. Supp. 2d 55, 79 (E.D.N.Y. 2008) (involving a defendant that, among other things, apparently had "chang[ed] the minds" of two members of the collective who withdrew from the case). The Court recognizes, however, that the parties have had the opportunity to engage in discovery, and, despite Homesite's objections, Sigler's counsel did contact approximately eleven percent of CSAs identified by Homesite, see D. 57 at 3. Nearly more than a year since the filing of Sigler's complaint, she remains as the sole named plaintiff, and she has not made a showing that any other

15

putative collective member has any interest in joining the lawsuit. D. 65 at 1. Troche did not indicate in her declaration that she has an intent to join the suit, see generally D. 57-5, and neither did the redacted source, see generally D. 57-6. See Jiang, 2024 WL 4872395, at *11 (noting that "[d]espite the extended period of time [of nearly eighteen months after the filing of the complaint], and plaintiff's allegedly close relationships with the putative collective members, he has made no showing whatsoever that even a single other employee has any interest in actually joining the lawsuit"); see also Chavira, 2019 WL 4769101, at *9 (explaining that "[t]o allow a putative collective action to proceed to the notice state on the basis of one named plaintiff's affidavit, without supporting documentation relevant to Massachusetts locations, pushes an already 'low' burden significantly lower"). In light of the Court's conclusion that Sigler has not made the sufficient factual showing necessary to establish that other putative class member(s) are similarly situated, and given that "[a] core purpose of permitting collective actions is 'to serve the interest of judicial economy,' Jiang, 2024 WL 4872395, at *11 (internal quotation marks and citation omitted); see Burns, 881 F. Supp. 2d at 235-36 (concluding plaintiff did not meet burden to establish that case was appropriate for conditional certification where there was "[an] absence of facts to support plaintiff's conclusory assertion of widespread violations and [] ambiguity with respect to the number and interest of the putative class members"), the lack of interest in joining the collective action also does not suggest that certification is warranted here.

Accordingly, the Court concludes that Sigler has not met her burden of demonstrating that there are similarly situated employees and declines to grant conditional certification to the proposed collective action under the FLSA.

## VI. Conclusion

For the foregoing reasons, the Court DENIES Sigler's motion for conditional certification, D. 33.

**So Ordered.**

/s Denise J. Casper<br>Chief United States District Judge